**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH KEELING, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 23-cv-3442 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| LAKE COUNTY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **MEMORANDUM OPINION AND ORDER**

Joseph Keeling, a detainee at the Lake County Jail, had a few health problems. He suffered from a blood pressure condition that made him vulnerable to fainting and falling.

Keeling received a medical evaluation during the jail's check-in process. The nurse jotted down the information and recommended that Keeling receive a cell assignment on a lower tier. She recommended a bottom bunk, too.

The next day, Keeling received his cell assignment, and he got stuck with a top bunk. He protested, but to no avail. He climbed up the bunk and got into bed. Within an hour, Keeling had a seizure, for the first time in his life. The seizure required hospitalization.

Keeling responded by filing a complaint against the Sheriff of Lake County and Lake County itself. He brings a claim under Title II of the ADA, alleging that they failed to give him a reasonable accommodation for his disability. After discovery, Defendants moved for summary judgment.

For the reasons explained below, the motion for summary judgment is granted in part, and denied in part.

**Background**

Joseph Keeling entered the Lake County Jail as a pretrial detainee on June 8, 2022. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 1 (Dckt. No. 47).

Keeling has a history of problems with his blood pressure. Specifically, Keeling has suffered from recurrent hypertensive crisis associated with tachycardia and frequent fainting and falls. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 1 (Dckt. No. 50).

"Hypertensive urgency is a marked elevation in blood pressure without evidence of target organ damage, such as pulmonary edema, cardiac ischemia, neurologic deficits, or acute renal failure." *See* William D. Alley & Eddie L. Copelin II, *Hypertensive Urgency*, NIH: National Library of Medicine (Sept. 4, 2023), https://www.ncbi.nlm.nih.gov/books/NBK513351/.

Tachycardia is a blood-pressure condition that substantially impairs circulatory function. It is a disability under the ADA. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 2 (Dckt. No. 50); 42 U.S.C. § 12102(1); *Gogos v. AMS Mechanical Systems, Inc.*, 737 F.3d 1170, 1172–73 (7th Cir. 2013).

Keeling received a medical screening when he arrived at the jail. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 3 (Dckt. No. 47). "[T]he standard operating procedure at the Lake County Jail is for medical personal [sic] to perform a single intake screening, which includes completing one 'Identification of Special Needs' form." *Id.* at ¶ 4.

Gianelle Gregorio, a nurse, did the medical screening. She gathered information, took his blood pressure, and prepared a comprehensive screening form. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 3 (Dckt. No. 50). She took down his blood pressure. It was high. *See* 6/8/22 Receiving Screening Form (Dckt. No. 42, at 46 of 108).

2

As part of the medical screening, Nurse Gregorio completed Keeling's "Identification of Special Needs" form, dated June 8, 2022 (the "Special Needs form"). *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 5 (Dckt. No. 47); *see also* 6/8/22 Identification of Special Needs Form (Dckt. No. 42, at 53 of 108).

On the form, Nurse Gregorio memorialized the fact that Keeling had a history of hypertensive crisis. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 5 (Dckt. No. 47). "Hx of recurrent hypertensive crisis, hx frequent fainting/falls during hypertensive crisis." *See* 6/8/22 Identification of Special Needs Form (Dckt. No. 42, at 53 of 108).

Based on that medical condition, Nurse Gregorio checked boxes on the form to show that Keeling needed to receive accommodations. The completed form stated that Keeling should receive an assignment to a lower tier, and should receive a lower bunk. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 5 (Dckt. No. 47); 6/8/22 Identification of Special Needs Form (Dckt. No. 42, at 53 of 108).

Keeling didn't get a cell assignment right away. He stayed overnight in a holding cell in the booking area because he had a court date the next morning. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 5–6 (Dckt. No. 50).

The parties debate the next scene of the story. By the look of things, the parties disagree whether the next scene was part of the story at all. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 6–7 (Dckt. No. 47).

Defendants contend that Keeling received a second medical screening on June 9, meaning the day after the first medical screening on June 8 by Nurse Gregorio. But this time, a different nurse – Gina Almas – did the exam.

There isn't much in the record about the second exam. Nurse Almas did not testify, because she has passed away. By the look of things, no one testified that Keeling received a fulsome medical exam on June 9. In fact, the parties have not pointed to any testimony that Nurse Almas examined Keeling on June 9 at all.

Documentation about the second exam is sparse, at best. On June 8, Nurse Gregorio prepared a detailed Receiving Screening form that spans five pages. *See* 6/8/22 Receiving Screening Form (Dckt. No. 42, at 46–50 of 108). She prepared an Assessment form, too. *See* 8/8/22 Assessment Form (Dckt. No. 42, at 51 of 108). No such documents appear in the record for June 9.

But Defendants do point to a second Identification of Special Needs form in the record. The second form is dated June 9, meaning one day after the form signed by Nurse Gregorio. *See* 6/9/22 Identification of Special Needs Form (Dckt. No. 42, at 53 of 108). Nurse Almas allegedly prepared it.

Importantly, the content of the second Special Needs form allegedly prepared by Nurse Almas (on June 9) is different than the content of the first Special Needs form prepared by Nurse Gregorio (on June 8). The second form says nothing about high blood pressure, or hypertensive crisis, or a history of frequent fainting or falls. In fact, it says nothing on that topic at all.

And critically, the second Special Needs form did not indicate that Keeling needed any accommodations. The boxes for "Lower Tier" and "Lower Bunk" went unchecked. *See* 6/9/22 Identification of Special Needs Form (Dckt. No. 42, at 53 of 108).

In his brief, Keeling disagrees with the notion that a second exam took place at all. He also takes issue with the admissibility of the second form.

4

In fact, Keeling smells a rat. He believes that the report is phony, and that the jail created the form after the seizure. "[T]he record viewed in the light most favorable to plaintiff is that the second form was inserted into the medical records after plaintiff had his seizure, as part of a corrupt scheme to avoid liability." *See* Pl.'s Resp. Brf., at 10–11 (Dckt. No. 46).

For now, this Court will put that issue to one side. The important point is that the parties have a dispute about whether Keeling received a second exam, and whether Nurse Almas ever completed a second Special Needs form.[1]

Turning back to the undisputed part of the story, Keeling started the day of June 9 in the booking area. He participated in a video hearing in state court.

That afternoon, officers took Keeling from a holding cell in the booking area to the classification pod. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 10 (Dckt. No. 47); *see also* Movement History Report (Dckt. No. 42, at 57 of 108). Housing units at the jail are known as "pods." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 5.

---

[1] The authenticity of the second Special Needs form is a question of fact, and this Court must draw all reasonable inferences in favor of Keeling as the non-movant. Still, the authenticity of the form is not a *material* fact. The parties debate the admissibility of the form, but in the end, it doesn't matter. Even if the form is admissible, it would not entitle Defendants to summary judgment. In fact, even if Nurse Almas did perform a second evaluation (on June 9) and prepared a second Special Needs form, that fact would not entitle Defendants to summary judgment. At best, that fact would show that the officers who made the cell assignments had two forms with two recommendations: one recommended a lower tier and a lower bunk, and the other did not. Even if that's what happened, Defendants could not get summary judgment on those grounds. Having a form that lacked a recommendation for accommodations would not entitle Defendants to summary judgment when they also had a form that *did* recommend accommodations. True, Deputy Chief Kalfas did testify that, when making housing decisions, the latest Special Needs form is what matters. He testified: "When they basing [sic] a decision on where to house somebody, they will go with the most recent or the most current Special Needs Form and make their decision based on that." *See* Kalfas Dep., at 34:10-14 (Dckt. No. 42, at 67 of 108). But that's not an undisputed fact. It did not appear in the Rule 56.1 statements, except Defendants quoted it in response to paragraph 14 of Plaintiff's statement of additional facts. Plaintiff didn't sign off on that fact, so it is not undisputed. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 14 (Dckt. No. 50).

As the name suggests, the classification pod is the place where officers figure out where detainees should go. Classification officers complete interviews, gather information, and assign detainees to a more permanent housing location at the jail. *Id.* at ¶¶ 10–11; *see also* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 14 (Dckt. No. 50).

The assignment includes the detainee's cell, as well as his bed. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 10–11 (Dckt. No. 47).

Nurses complete medical forms, but they do not make the actual housing decisions for the detainees. Classification officers decide who goes where.

Classification officers consider a bunch of information when making assignment decisions. The information includes any Identification of Special Needs forms. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 14 (Dckt. No. 50).

Keeling went through that process. A classification officer assigned Keeling to a specific cell. And more importantly, Keeling got assigned to a top bunk, not a bottom bunk. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 12 (Dckt. No. 47). The officers then moved Keeling to his cell in his new pod. *Id.* at ¶¶ 14, 17.

The pod officers do not alter the cell or bunk assignments made by the classification officers. *Id.* at ¶ 18. But they can investigate if a detainee objects to an upper bunk when he thinks he should have gotten a lower bunk. *Id.* at ¶ 19; *see also* Defs.' Statement of Facts, at ¶ 19 (Dckt. No. 42).

Keeling remembers talking to a female pod officer who took him to his cell. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 20–22 (Dckt. No. 47). But Keeling doesn't recall any additional details about her, including her name, age, or skin color. *Id.*

At deposition, Keeling testified that he told the pod officer that he couldn't get in the top bunk. *See* Keeling Dep., at 81:24 – 82:5 (Dckt. No. 42, at 35 of 108); *see also* Defs.' Statement of Facts, at ¶ 23 (Dckt. No. 42).[2] According to Keeling, he told the officer about the Identification of Special Needs form, too, including the need for a lower bunk.

Keeling testified: "[T]here was a guy on the bottom bunk already and I said I can't get on the top bunk. I hadn't attempted to get on the top bunk at this time and I said I have a medical – because I had the special identification needs thing that was filled out by the nurse." *See* Keeling Dep., at 81:23 – 82:5 (Dckt. No. 42, at 35 of 108).

Keeling testified that the officer responded with a snarky comment: "this is not a hotel." *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 8 (Dckt. No. 50).

Before long, Keeling climbed into the top bunk. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 23 (Dckt. No. 47). The parties disagree about whether the officer ordered Keeling to get into the top bunk, but that fact is immaterial. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 9 (Dckt. No. 50). He got up there.

Within the hour, things went downhill fast. Keeling had a seizure, for the first time in his life. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 23, 25 (Dckt. No. 47); Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 10 (Dckt. No. 50).

Based on the records, Keeling had a seizure sometime between 4:35 p.m. and 4:43 p.m., less than an hour after leaving the classification pod. *See* Pl.'s Resp. to Defs.' Statement of

---

[2] Keeling didn't respond to paragraph 23 of Defendants' Statement of Facts, so it is deemed admitted. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 22–23 (Dckt. No. 47); Defs.' Statement of Facts, at ¶ 23 (Dckt. No. 42). Instead, Keeling skipped over paragraph 23, and responded to paragraph 24, but labeled it a response to paragraph 23. The mistake had a domino effect. All of the remaining numbers are off. There is no response to paragraph 23. Instead, Keeling's response to paragraph 24 looks like a response to paragraph 23, and Keeling's response to paragraph 25 looks like a response to paragraph 24, and so on. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 23; Defs.' Statement of Facts, at ¶ 24.

Facts, at ¶ 23 (Dckt. No. 47); Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 10 (Dckt. No. 50).

Officers somehow got word of the situation. The record doesn't reveal how things unfolded. Maybe his cellmate cried out for help. Or maybe one of the officers heard something.

Help soon arrived. One of the officers arrived and unlocked the cell. The officer turned on his body worn camera, too. The footage captured what happened next. *See* Bodycam Footage (Dckt. No. 45).

The footage begins with the officer unlocking the cell and opening the door. Keeling was laying on the top bunk. He was sprawled out, hanging all over the place, on and off his bunk.

Much of his body was hanging over the sides of the bed. Both legs hung over the long side of the bunk, and Keeling's head and shoulders slumped over the top of the bunk. His torso was on the bunk, but not much else.

Keeling was unresponsive. He wasn't moving. By the look of things, vomit was on his clothing, and on the floor.

A nurse appeared and tried to elicit a response. None came. Keeling's breathing was strained and obstructed. It sounded like Keeling was choking.

At one point, the officer commented: "He's turning blue, too."

About a minute into the video, Keeling began twitching badly. The footage is imperfect, but it does show Keeling on the top bunk having a seizure. The shadows captured the flailing, too.

A second nurse soon arrived, and so did two more officers. Two of the officers lifted Keeling out of the bunk, carried him out of the cell, and placed him on a mat in the hallway.

Keeling later described what he went through. He testified that he bit his tongue and experienced pain in "like every bone all of the left side of [his] face" and felt "like [his] head was going to explode." *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 10 (Dckt. No. 50). He also experienced short-term memory loss and twitching on the left side of his face. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 28 (Dckt. No. 47).

At the time, Keeling didn't realize that he was having a seizure. He only "learned about his seizure after an extended period of hallucinations that occurred" after he went to another jail. *Id.* at ¶ 27.

Keeling received medical treatment at the Lake County Jail. Then, Keeling was transported to Vista Medical Center. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 12 (Dckt. No. 50). The Vista Medical Center discharged Keeling after its physicians reviewed blood tests, x-rays, and a CT Brain/Head scan. *Id.* at ¶ 13.

Keeling later sued the Sheriff of Lake County, Officer Doe, and Lake County itself. *See generally* Complaint (Dckt. No. 1). After a few motions to dismiss, Keeling filed the second amended complaint, which is the operative pleading. *See* Second Am. Cplt. (Dckt. No. 39).

Only one claim remains. Keeling brings a claim under Title II of the ADA against the Sheriff of Lake County in his official capacity, and against Lake County. *Id.* at ¶¶ 3–4. Keeling alleges that Defendants denied him a reasonable accommodation under the ADA, and that the denial caused his seizure and related injuries. *Id.* at ¶¶ 12–13.

### Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322.

**Analysis**

The motion for summary judgment presents two different issues. The first question is whether Keeling presented enough evidence on the issue of liability under Title II of the ADA. The second question is whether Keeling came forward with proof that the alleged violation of the ADA caused him to suffer a seizure.

Based on this record, a reasonable jury could conclude that Defendants violated the ADA by failing to accommodate his need for a lower bunk. But no reasonable jury could conclude that the failure to provide a bottom bunk caused Keeling to have a seizure.

10

I.      **Title II of the ADA**

Keeling brings a disability-discrimination claim under Title II of the ADA.  When it comes to a violation of the statute, Keeling has presented enough evidence to get to trial.

In the simplest of terms, Title II prohibits public entities from discriminating against disabled people "by reason of" their disabilities.  *See* 42 U.S.C. § 12132.  "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  *Id.*

The statutory text is a bit of a mouthful, and doesn't exactly roll off the tongue.  A few of the phrases don't play nicely together.

The text covers an exclusion from participating in something, plus a denial of benefits, as well as discrimination.  That combination makes it difficult to simplify from a phraseology perspective.  The phrase "be excluded from participation in or be denied the benefits of the services, programs, or activities of" is an awkward mishmash.  It practically begs the reader for a few extra rereads.  And the passive voice doesn't help the situation.

The text also includes two smaller openings for a claim, and then a much larger catch-all.  The statute applies to excluding a disabled person from participating in services, programs, or activities, *or* denying a disabled person the benefits of services, programs, or activities, *or* discriminating against a disabled person.  The ban on discrimination seems all-encompassing, swallowing the two earlier avenues for liability.

The Seventh Circuit has translated the statutory text into three requirements for a claim.  "[A] plaintiff must show:  (1) that he is a qualified individual with a disability; (2) that he was denied the benefits of the services, programs, or activities of a public entity or otherwise

11

subjected to discrimination by such an entity; and (3) that the denial or discrimination was by reason of his disability." *Lacy v. Cook Cnty., Illinois*, 897 F.3d 847, 853 (7th Cir. 2018) (internal quotation marks omitted); *see also McDaniel v. Syed*, 115 F.4th 805, 822 (7th Cir. 2024) ("To avoid summary judgment under the ADA and the Rehabilitation Act, McDaniel must offer evidence that '(1) he is a qualified person (2) with a disability and (3) the Department of Corrections denied him access to a program or activity because of his disability.'"). That recitation mentions the discrimination prong and the denial-of-benefits prong, but not the exclusion-from-participation prong. Maybe "discrimination" swallowed it.

Putting things in the active voice is another way to go. Breaking down the text into its component parts, (1) a public entity (2) cannot discriminate against, *or* exclude from participating in services, programs, or activities, *or* deny the benefits of services, programs, or activities to (3) a qualified individual with a disability (4) because of that person's disability.

On this record, Keeling has presented enough evidence to get to a jury on the issue of liability, meaning whether Defendants violated the ADA. Keeling has checked all of the evidentiary boxes.

The parties agree on some of the elements. The parties agree that Keeling has a qualifying disability under the ADA. *See* Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 1–2 (Dckt. No. 50). The parties also agree that Defendants are public entities, given that Keeling sued Lake County and the Sheriff in his official capacity. *See* Second Am. Cplt., at ¶¶ 3–4 (Dckt. No. 39); Answer to Second Am. Cplt., at ¶¶ 3–4 (Dckt. No. 40).

The next element is adverse treatment. Again, the statute applies to discrimination, plus an exclusion from participation, plus a denial of benefits. That's three roads to liability, and sometimes they merge.

Keeling claims that Defendants failed to accommodate his disability by failing to give him a bottom bunk. "It is well established that '[r]efusing to make reasonable accommodations is tantamount to denying access.'" *McDaniel*, 115 F.4th at 823 (citation omitted); *see also A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d 587, 592–93 (7th Cir. 2018) ("[D]isability discrimination under . . . [Title II of] the ADA can be established in three different ways: '(1) the defendant intentionally acted on the basis of the disability, (2) *the defendant refused to provide a reasonable modification*, or (3) the defendant's rule disproportionally impacts disabled people.'") (emphasis added) (quoting *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999)).

Title II requires reasonable accommodations when a disabled person would not have access to benefits or services without accommodations. *See Zimny v. Geneva Cmty. Unit Sch. Dist. 304*, 718 F. Supp. 3d 766, 784 (N.D. Ill. 2024) ("Accommodations are 'only . . . required when *necessary* to avoid discrimination on the *basis* of a disability.'") (emphasis in original) (quoting *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 529 (7th Cir. 2014)).

Title II does apply to some aspects of prison life. Standing alone, "incarceration is not a program or activity." *See Jaros*, 684 F.3d at 672. Even so, prisons do provide programs and activities, and they count under the statute.

"In a prison, qualifying programs and activities include meals, medical care, showers, toilets, and the like." *See McDaniel*, 115 F.4th at 823. Courts in this district have held that "sleep and sleeping facilities are covered by Title II," too. *See Edwards v. Dart*, 2022 WL 3543474, at *5 (N.D. Ill. 2022) (citing cases); *Price v. Illinois Dep't of Corr.*, 2022 WL

13

1016558, at *2 (N.D. Ill. 2022) ("[C]ourts in this Circuit have recognized sleep- or bed-related issues, as well as showers, as programs or activities at a prison[.]").[3]

A plaintiff has the burden to present evidence that the defendant failed to offer a reasonable accommodation. *See McDaniel*, 115 F.4th at 822. If the plaintiff carries that burden, then "the burden shifts to the [Department] to prove that the requested accommodation would impose an undue hardship." *Id.* (citation omitted).

An inmate can satisfy his burden by demonstrating that the prison refused to provide a reasonable accommodation, and that the denial prevented the plaintiff from accessing programs or services. *See A.H.*, 881 F.3d at 592–93; *McDaniel*, 115 F.4th at 831; *Jaros*, 684 F.3d at 672 ("The refusal to accommodate [plaintiff's] disability kept him from accessing meals and showers on the same basis as other inmates."). Courts look for evidence of something that a disabled person couldn't meaningfully do because the prison denied the accommodation. *See McDaniel*, 115 F.4th at 824 ("[D]uring his year at [the prison], [plaintiff] missed some 600 meals and many doses of his medications because the stairs . . . impeded his access.").

Here, Defendants do not put up much of a fight on the issue of an accommodation. Defendants do not take issue with the notion that they could have provided a reasonable accommodation by assigning Keeling to a lower bunk. Defendants also do not argue that providing Keeling with a lower bunk would have imposed an undue burden.

---

[3] Courts seem to have adopted a broad interpretation of "services, programs, or activities." One could be forgiven for wondering if the thick coat of judicial gloss has, in a round-about way, added the word "facilities" to the statute. After all, lots of things could fit within an expansive definition of an "activity." At times, the interpretative path seems a bit circuitous. It's not a natural way of speaking to say that assigning a detainee to a top bunk has denied that person access to a protected activity.

14

At one point, Defendants suggest that they did not deny Keeling any benefits because Nurse Gregorio recommended a lower bunk. *See* Defs.' Mtn. for Summ. J., at 5 (Dckt. No. 41). But there is a big difference between recommending an accommodation and providing one.

Defendants also fault Keeling for failing to present evidence that they intentionally deprived him of a benefit. *See* Defs.' Mtn. for Summ. J., at 1 (Dckt. No. 41). That's not necessary.

Evidence of intent is one path to liability, but it is not the only path to liability. A plaintiff can prove discrimination by offering evidence of intent. But a plaintiff doesn't *have to* prove discrimination by offering evidence of intent.

"[L]iability under Title II of the Discrimination Act [need not] be premised on an intent to discriminate on the basis of disability." *See Washington*, 181 F.3d at 846; *see also A.H.*, 881 F.3d at 592 ("While the statutory language suggests that proof of disability discrimination requires intent, the statutes, corresponding regulations, and the Supreme Court have made clear that other methods of proving disability discrimination are available."); *A.J.T. v. Osseo Area Schools*, 605 U.S. 335, 344 (2025) ("[T]he general approach of the courts of appeals . . . permits plaintiffs to establish a statutory violation and obtain injunctive relief under the ADA and Rehabilitation Act without proving intent to discriminate.").

The last requirement of a claim is a connection between the denial of a benefit (on the one hand) and the plaintiff's disability (on the other). Again, the statute requires a plaintiff to prove that a public entity deprived the plaintiff of something "by reason of such disability." *See* 42 U.S.C. § 12132.

The Seventh Circuit reads that language to create a causation requirement. A plaintiff must prove "that, 'but for' his disability, he would have been able to access the services or

benefits desired." *See A.H.*, 881 F.3d at 593; *see also Washington*, 181 F.3d at 849 ("The 'by reason of' language merely indicates that he must establish that, but for his learning disability, he would have been eligible to play sports in his junior year.") (quoting the statute).

In the failure-to-accommodate context, Title II requires evidence that the failure to accommodate caused a denial of benefits. In other words, an inmate must show that he would have received the benefit but-for the disability. The question is whether the plaintiff would have had Benefit X if he did not suffer from Disability Y.

As an aside, the statute requires two types of causation before a plaintiff can recover damages for a personal injury. One form of causation involves the connection between the disability and the loss of benefits. The other form of causation is the causal connection between the alleged violation of the statute and the injury.

For example, imagine if an inmate used a wheelchair in a prison that lacked ramps for staircases. And then, imagine if the inmate climbed the stairs on his hands and knees, and coincidentally suffered a toothache at the same time.

In that hypothetical, the inmate may have lost a benefit (going up stairs to access an upper floor) by reason of his disability, because he couldn't go up the stairs without a ramp. So there might be a violation of the ADA. But the violation of the ADA didn't cause the physical injury, because the toothache had nothing to do with the lack of ramp.

At this point, the question is not whether the denial of benefits caused Keeling to suffer an *injury*. That issue is yet to come, and this Court will get to it when it turns to the issue of compensatory damages (stay tuned). At this juncture, the question is whether the disability was the but-for cause of the denial of benefits. That is, the question is whether Keeling lost benefits because of his disability.

16

Keeling does not spell out, with any level of specificity, how Defendants deprived him of the benefit of a service, program, or activity. The prison didn't deny him a bunk – he got a bunk. The prison also didn't give him a bunk that he could not access – he climbed up there. Maybe the activity is getting into a bunk without difficulty, but if so, Keeling doesn't say so.

Another possibility is that Keeling lost the ability to engage in the activity of sleeping. That's a bit tough to square with this record. After all, Keeling was in his cell for only an hour, give or take. He was there in the middle of the afternoon, with all the lights on. That's not a typical time for sleeping (siestas aside). Keeling doesn't argue that he wanted to sleep in his bed, but couldn't, and therefore lost the ability to sleep.

Or maybe the protected activity is simply laying or sitting on a bunk bed, even when it's not time to sleep. After all, his cellmate was sprawled on the lower bunk. Maybe Keeling wanted to sprawl, too.

Still, other courts have recognized Title II claims based on a prison's failure to accommodate bunking needs. *See Westmoreland v. Dart*, 2023 WL 4273661, at *9, *11 (N.D. Ill. 2023) (finding a detainee "was denied access to the program or activity of sleeping[] and that the denial was on account of his disability" when "because of his disability and given his upper bunk assignment, he was unable to [access the activity of sleeping] without a significant risk of injury"); *Simmons v. Godinez*, 2017 WL 3568408, at *6 (N.D. Ill. 2017) ("Because Plaintiff sufficiently alleges that Wexford and IDOC failed to take steps that would allow Plaintiff to access a bed, either by issuing a low-bunk pass or by providing him a ladder or other assistive device, the Court finds that Plaintiff has stated a plausible claim under the ADA and Rehabilitation Act[.]").

17

Defendants could be liable for denying Keeling the ability to sleep even though Keeling arrived at his cell in the afternoon and could have sat in a chair instead of climbing into bed. *See Westmoreland*, 2023 WL 4273661, at *8–9, *11 (finding that a detainee "was denied access to the program or activity of sleeping" even though the detainee "had just arrived to the tier, it was the middle of the afternoon, he could have slept on the floor or on [a] stool, he had made no request to be moved to a lower bunk, and . . . [he] took the risk of climbing to the top bunk").

At the summary judgment stage, the burden rests on the movant, not the non-movant. Defendants did not make much of an argument, if any, that Keeling failed to bring evidence that they denied him the benefits of a service, program, or activity. So the claim survives.

Overall, the record reveals that Keeling presented enough evidence to get to a jury on the issue of a violation of the ADA. Keeling had a blood pressure condition, and Defendants could have accommodated that disability by offering him a lower bunk. A reasonable jury could conclude that the denial of a lower bunk amounted to discrimination or a denial of benefits on the basis of his disability.

## II. Compensatory Damages

The next question is whether Keeling presented enough evidence on the issue of compensatory damages. Liability is one thing; damages are another.

To recover compensatory damages for a personal injury under the ADA, a plaintiff must overcome a few additional hurdles, above and beyond proving a violation of the statute. The hurdles include intent and causation.

For starters, a plaintiff must prove that defendants acted intentionally – that is, with deliberate indifference. *See Hildreth v. Butler*, 960 F.3d 420, 431 (7th Cir. 2020) ("To receive compensatory damages, [the plaintiff] must show deliberate indifference . . . ."). A plaintiff also

must prove that the violations caused the alleged injuries. *See Guzman v. City of Chicago*, 689 F.3d 740, 745 (7th Cir. 2012) (asking whether plaintiff's injuries "were [] proximately caused by the unlawful [act]" to determine the availability of damages).

Defendants argue that Keeling failed to satisfy his burden on both points. For now, this Court will put the issue of intent to the side. This Court agrees that Keeling has failed to present evidence that could support a finding by a reasonable jury that the lack of a bottom bunk caused his seizure.

In general, to recover compensatory damages, a plaintiff must prove an injury, causation, and the amount of damages. *See Guzman*, 689 F.3d at 745. That's true in all sorts of areas of the law. *See, e.g.*, *Henderson v. Sheahan*, 196 F.3d 839, 848 (7th Cir. 1999) ("Ordinarily, to obtain an award of compensatory monetary damages, under § 1983 a plaintiff must demonstrate both that he has suffered an 'actual' present injury and that there is a *causal connection* between that injury and the deprivation of a [federally] protected right caused by a defendant.") (emphasis added); *Maus v. Murphy*, 29 Fed. App'x 365, 369 (7th Cir. 2002) ("The basic tort-law rule requiring a plaintiff to show that the defendants *caused* the plaintiff's injuries applies with equal force to deliberate indifference claims under the Eighth Amendment.") (emphasis added).

Causation is a bread-and-butter part of a claim for damages for a personal injury. A plaintiff can recover damages for a personal injury only if the defendants caused the injury. No causation, no damages.

The Seventh Circuit hasn't squarely addressed the issue of causation and compensatory damages under Title II. But it has said that plaintiffs suing about injuries related to a top-bunk assignment are "using the ADA and the Rehabilitation Act to pursue, in federal court, what is effectively a state-law tort claim." *See Turnage v. Dart*, 16 F.4th 551, 552 (7th Cir. 2021). And

19

the Seventh Circuit requires causation as "a standard element of tort liability" when the underlying federal claims exist "against the background of tort liability." *See Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012) (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)) (requiring but-for and proximate causation for liability under 42 U.S.C. § 1983 for a fabrication-of-evidence claim).

So, causation is a required element for compensatory damages under Title II, too. A plaintiff cannot recover compensatory damages under Title II for a personal injury unless the violation of Title II caused the personal injury. Other courts in this district have reached the same conclusion. *See Westmoreland*, 2023 WL 4273661, at *7 (quoting *Turnage*, 16 F.4th at 552 and *Whitlock*, 682 F.3d at 582). "[B]ecause [Keeling] seeks damages for injuries he contends he suffered as result of the denial of access [to sleep], he must show that the violation of his rights was the proximate cause of his injuries." *Id.* at *10.

Keeling presented evidence that he suffered an injury. That fact is inescapable. He had a seizure, and injured himself in the process. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 10 (Dckt. No. 50). He bit his tongue. *Id.* He felt pain "like every bone all of the left side of [his] face" and "like [his] head was going to explode." *Id.*

But Keeling came up short on the issue of causation. Again, Keeling must prove that the denial of a bottom bunk caused an injury. Put another way, Keeling must prove that forcing him into the top bunk caused him to suffer a seizure.

Keeling did express his personal beliefs about why he suffered a seizure. Keeling testified that, in his view, "the hypertension [from] getting on the top bunk" caused the seizure. *See* Keeling Dep., at 91:20-23; *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 29 (Dckt. No. 47).

20

That's a theory, at best. Keeling's own testimony does not get him very far on the issue of causation. He has no medical training. He lacks personal knowledge about what caused the seizure. *Ipse dixit* isn't good enough for experts, and it isn't good enough for lay people, either.

Maybe the situation would be different if Keeling had a track record of seizures. Imagine, for example, if Keeling had a history of having seizures whenever he had to climb into a top bunk. That track record might support the inference that getting into this particular top bunk caused the injury, too. But that's not this case – Keeling had never had a seizure before.

Keeling didn't present any testimony from any of the treating physicians. Keeling also did not offer an expert, either. Keeling presented no evidence from anyone with medical training about what caused the seizure.

Expert testimony is not always necessary. Expert testimony is "unnecessary in cases where a layperson can understand what caused the injury." *See Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 643 (7th Cir. 2010). Sometimes causation is within a jury's "common experiences or observations." *See Hendrickson v. Cooper*, 589 F.3d 887, 892 (7th Cir. 2009). "[F]or example, when a plaintiff suffers from a broken leg or a gash when hit by a vehicle, he doesn't need to produce expert testimony." *See Myers*, 629 F.3d at 643.

But when there are "complicated question[s] of medical causation," a plaintiff needs to "support his theory of causation with some objective medical evidence." *See Hendrickson*, 589 F.3d at 892. A plaintiff must offer an expert who can testify "that *this* [act by the defendant] caused *this* particular plaintiff's malady." *See Myers*, 629 F.3d at 643–44 (emphasis in original).

Such "complicated question[s]" include injuries that "can be caused by a myriad of factors, none of which is obvious or certain." *See Hendrickson*, 589 F.3d at 892; *Myers*, 629 F.3d at 643 (noting expert necessary when "there is no obvious origin to an injury and it has

'multiple potential etiologies, expert testimony is necessary to establish causation'") (quoting *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46–47 (2d Cir. 2004)).

The case law offers some illustrations. An expert would need to testify about the cause of joint damage, arthritis, and other "wear and tear" injuries that develop over years and "can be the product of many factors." *See Myers*, 629 F.3d at 641, 643. Expert testimony is also needed to prove that obscure respiratory illnesses resulted from a "brief encounter" with a toxic gas. *See Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 702 (7th Cir. 2015) (noting that a "typical layperson does not possess the requisite knowledge to draw a causative line").

Sometimes a causal connection is obvious. For example, imagine if someone experienced altitude sickness or suffered a heart attack after climbing to the summit of Mount Kilimanjaro. It wouldn't be a stretch for a reasonable jury to conclude that climbing the mountain had something to do with it.

That's not this case. Keeling presented evidence that he suffered from a blood pressure condition. But nothing in the act of climbing a few feet off the ground and getting into the top bunk is so strenuous that it could, viewed on its own, support a finding of causation.

A top bunk is not Mount Kilimanjaro. It is only a few feet off the ground, and Keeling was only 32 years old at the time. *See* Keeling Dep., at 4:17-18 (Dckt. No. 42, at 35 of 108). True, Keeling did testify that he was "struggling to get up" in his bunk. *Id.* at 83:22. Still, that's a thin reed. A struggle to get into a top bunk, standing alone, cannot support an inference that the climb caused a seizure, even if the person had high blood pressure.

The connection between getting in a top bunk and having a seizure is not obvious, even for someone with a blood pressure condition. It's not like dropping an anvil on your foot, and then wondering why your toe hurts.

22

Lots of things can cause seizures. A quick internet search illustrates the point. The Mayo Clinic pointed to plenty of things that can cause seizures. *See Seizures*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/seizure/symptoms-causes/syc-20365711 ("Epilepsy is a common cause of seizures. But not everyone who has a seizure has epilepsy. Sometimes the following can cause seizures: A high fever . . . An infection of the brain . . . Serious illness . . . Lack of sleep . . . Low blood sodium . . . Certain medicines that treat pain or depression or help people stop smoking . . . A new, active brain injury, such as head trauma . . . The use of drugs that are sold on the streets . . . [and] Alcohol misuse.") (last viewed March 17, 2026); *Seizure*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/22789-seizure ("Seizures can happen for many different reasons.") (giving a list of potential causes, including aneurysms, brain tumors, cerebral hypoxia, cerebrovascular disease, diabetes, concussions or other brain injuries, degenerative brain diseases, eclampsia, electrolyte problems, epilepsy, genetic conditions, hormone-related change, infections, inflammation from autoimmune conditions, mental health issues, strokes, toxins, poisons, and venomous bites or stings) (last viewed March 17, 2026).

Keeling needed to build a causal connection. Bridging the causal gap requires some type of medical evidence. Maybe getting in the top bunk contributed to the seizure, or maybe not. But if so, Keeling needed to lay the evidentiary foundation. And he didn't.

Apart from his personal views, Keeling offered no support for the notion that the top bunk led to the seizure. The only other bit of evidence is a citation to a treatise for the high-level proposition that "chronic hypertension contributes to late onset of seizure." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 30 (Dckt. No. 47).

That generality doesn't get Keeling very far.  The question is not whether there is a relationship between high blood pressure and seizures.  The question is why Keeling suffered a seizure in that cell on that day.  And on that point, the treatise has nothing to offer.

Overall, viewing the record in a light favorable to Keeling, no reasonable jury could award him compensatory damages for the seizure on this record.  Maybe Defendants violated the ADA, but even if they did, Keeling failed to present sufficient evidence that the lack of a bottom bunk caused him to suffer a seizure.

### Conclusion

For the foregoing reasons, the Court grants in part and denies in part Defendants' summary judgment motion.  The motion is denied when it comes to a violation of Title II of the ADA.  But the motion is granted on the issue of compensatory damages.

Date: March 17, 2026

Steven C. Seeger
United States District Judge

24